# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

FABIO VARGAS-GONZALEZ,
*Defendant*.

No. 3:20-cr-00078 (JAM)

### ORDER DENYING MOTION TO SUPPRESS

The evidence in this drug trafficking case stems from the stop and search of a car that was driven by the defendant Fabio Vargas-Gonzalez. A federal investigation showed that Vargas-Gonzalez was in frequent contact with known or suspected drug traffickers and money launderers in several states. On March 11, 2020, law enforcement officers followed Vargas-Gonzalez as he drove from Connecticut to an address in New Jersey of a suspected drug trafficker. When Vargas-Gonzalez drove back to Connecticut, law enforcement initiated a traffic stop, searched his car, and found approximately two kilograms of fentanyl in a spare tire well.

Vargas-Gonzalez has moved to suppress the evidence that the police seized from his car. Because law enforcement had probable cause to believe that Vargas-Gonzalez had narcotics in the car, I conclude that the warrantless stop and search of the car was justified under the "automobile exception" to the warrant requirement of the Fourth Amendment. Therefore, I will deny the motion to suppress.

### BACKGROUND

Vargas-Gonzalez has been charged by indictment with possessing with intent to distribute 400 grams or more of fentanyl in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(vi).[1] He has moved to suppress the fentanyl and all other evidence obtained by law

---

[1] Doc. #24.

enforcement as a result of the search of his car.[2] Based on the evidence presented at the suppression hearing, I make the following factual findings.[3]

In early 2020, the Drug Enforcement Administration ("DEA") was investigating a drug trafficking organization in the area of Hartford, Connecticut.[4] A DEA task force officer—Officer Michael Breen—identified cell phone numbers that were being used by members of the drug trafficking organization.[5] As relevant here, the DEA was tracking the cell phone contacts of one of the members of the drug trafficking organization, identified as "RD," who had been intercepted in DEA investigations and who was involved with selling wholesale quantities of narcotics including heroin and fentanyl.[6]

In early February 2020, RD's cell phone communicated with a phone number identified by investigators as Target Telephone 7 and which did not have any identifying subscriber information.[7] The lack of legitimate subscriber information for a telephone is consistent with its use as a "work" phone, typically a disposable phone used by a drug trafficker for a short period of time in order to avoid detection by law enforcement.[8] Based on analysis of the phone's past communications, Officer Breen believed that Target Telephone 7 was being used by a member of the drug trafficking organization that he was investigating.[9]

---

[2] Doc. #37.
[3] The suppression hearing occurred over two days on April 5 and May 10, 2021. Docs. #61, #69 (transcripts). The correspondence of the page numbers to the witness testifying is as follows, with officers referred to by the titles they held at the time of the vehicle search: Doc. #61 at 8–108 (Tr. 8-108) (testimony of Officer Michael Breen); Doc. #61 at 109–67 (Tr. 109–67) (testimony of Trooper Phousisongkhamloy Chokbengboune); Doc. #69 at 6–57 (Tr. 175–226) (testimony of Trooper Anlly Diaz). Vargas-Gonzalez filed an affidavit in support of his motion to suppress, Doc. #36-6 at 4, but he did not testify at the suppression hearing.
[4] Doc. #61 at 12–13.
[5] Doc. #61 at 8–9, 13.
[6] Doc. #61 at 14, 20–21.
[7] Doc. #61 at 13–14.
[8] Doc. #61 at 10–12, 14.
[9] Doc. #61 at 13–14.

On February 5, 2020, a U.S. Magistrate Judge authorized a search warrant for a pen register and location tracking through the "E-911" system on Target Telephone 7 because it was believed to contain evidence of narcotics trafficking.[10] A pen register monitors the time and date of a phone number's incoming and outgoing call and text communications, although it does not provide their content.[11] E-911 location tracking provides the telephone's location approximately every 15 minutes.[12]

Using the E-911 location data, investigators tracked Target Telephone 7 to a location, where they saw parked a blue Honda Odyssey minivan.[13] Tracking the car with the location data as well as physical surveillance, investigators determined that a single individual was using Target Telephone 7 and driving the Honda Odyssey.[14] They then identified that individual as defendant Fabio Vargas-Gonzalez when the car and Target Telephone 7 were located at a business associated with someone related to Vargas-Gonzalez, and his driver's license photo matched the appearance of the driver of the Honda Odyssey.[15] Vargas-Gonzalez was the only person who was observed driving the Honda Odyssey during the DEA investigation.[16]

Along with showing regular communications between Target Telephone 7 and RD, the pen register showed that Target Telephone 7 was communicating with numerous telephone numbers that investigators had identified as belonging to suspected drug traffickers or money launderers, including:

---

[10] Doc. #61 at 14–17; Doc. #53–1 at 1–5 (Ex. 1).
[11] Doc. #61 at 15, 65–66.
[12] Doc. #61 at 15.
[13] Doc. #61 at 18.
[14] Doc. #61 at 18–19.
[15] Doc. #61 at 19–21.
[16] Doc. #61 at 30.

- A phone number with a 973 area code that had been previously intercepted during a DEA investigation in Massachusetts that found the user of the phone was coordinating narcotics transactions among several individuals.[17]

- A phone number based in Mexico used by the primary target of a DEA investigation in New York and Washington, DC who was believed to be arranging money laundering and narcotics-trafficking activities. The Mexican phone number, in turn, was in contact with a courier who was arrested with about $75,000 cash.[18]

- A phone number subscribed to Providencia De La Cruz, who had been identified through previous DEA investigations as a suspected money launderer and who was in contact with several individuals who were part of a New York money laundering organization.[19]

- A phone number used by Luis Rosario, who had been identified as a narcotics trafficker through prior DEA investigations and who was believed to be selling wholesale quantities of narcotics.[20]

- A phone number that was also communicating with a phone used by Jesus Torruella, who was identified as a large-scale narcotics trafficker through a DEA wiretap investigation. On January 24, 2020, the DEA seized 1.6 kilograms of fentanyl that was found on Torruella's person and about 2 kilograms of fentanyl that was found at his apartment, and Torruella was indicted on federal narcotics charges.[21]

- A phone number that was also communicating with a phone used by David Cintron, who the DEA identified—through the same wiretap investigation as Torruella—as a member of the same drug trafficking organization operating in the Hartford area. Cintron was arrested with a large quantity of prepackaged fentanyl during the wiretap investigation and charged with state and federal narcotics violations.[22]

Officer Breen's investigation also revealed that Vargas-Gonzalez was periodically driving the Honda Odyssey out of Connecticut.[23] On February 13, 2020, Vargas-Gonzalez drove from Connecticut to the Bronx, New York.[24] Officer Breen and other investigators observed him

---

[17] Doc. #61 at 21.
[18] Doc. #61 at 21–22.
[19] Doc. #61 at 22–23.
[20] Doc. #61 at 23.
[21] Doc. #61 at 23–26.
[22] Doc. #61 at 26, 79.
[23] Doc. #61 at 28.
[24] Doc. #61 at 29.

pick someone up for a period of about five to ten minutes, drive around a block, and then drop the passenger off and drive back toward Connecticut.[25]

On February 14, 2020, Target Telephone 7 traveled from Hartford to Queens, New York.[26] During the trip, Target Telephone 7 contacted only one phone number, which had a 917 area code and which DEA investigators in New York had determined was being used by a person identified by initials as "NM," a money launderer for narcotics proceeds.[27]

According to a DEA confidential source in New York, when members of one New York drug trafficking organization had a substantial amount of narcotics proceeds, they were instructed to contact the same 917 phone number to arrange to drop off the money at a specific business associated with NM.[28] NM owned a jewelry business in Queens, which a DEA investigation found was being used to launder narcotics proceeds.[29] Target Telephone 7 was close to NM's jewelry business for about half an hour during this trip to New York.[30]

On February 20, 2020, a U.S. Magistrate Judge authorized a search warrant for the placement and monitoring of a GPS tracker on the Honda Odyssey that Vargas-Gonzalez had been driving.[31] The search warrant explained that there was "probable cause to install and use a tracking device" on the Honda Odyssey "being used by Fabio Vargas-Gonzalez" on the basis that "the use of the tracking device will lead to evidence, fruits and/or instrumentalities" of narcotics and money laundering offenses.[32]

---

[25] Doc. #61 at 29–30.
[26] Doc. #61 at 31, 33.
[27] Doc. #61 at 31–33.
[28] Doc. #61 at 31–33.
[29] Doc. #61 at 84–85, 103.
[30] Doc. #61 at 33, 104.
[31] Doc. #61 at 34–35; Doc. #53-1 at 6–9 (Ex. 2).
[32] Doc. #53-1 at 7 (Ex. 2).

On February 23, 2020, Vargas-Gonzalez stopped using Target Telephone 7, but he immediately started using a phone number identified as Target Telephone 8 in a very similar manner, including by communicating with RD and several other numbers that had previously been in touch with Target Telephone 7.[33] Like Target Telephone 7, Target Telephone 8 did not have any subscriber information.[34]

On February 28, 2020, a U.S. Magistrate Judge authorized a search warrant for a pen register on Target Telephone 8.[35] The pen register showed that target Telephone 8 was communicating with a phone number with a 774 area code, which DEA investigators in Worcester, Massachusetts had identified as being used as a "work" phone by Yoerlyn Mercado.[36] DEA agents in Massachusetts had placed a tracking device on Mercado's vehicle, which showed that in late February 2020, at the same time Target Telephone 8 and the phone with the 774 area code were communicating, Mercado traveled to an area of Hartford within about 100 meters of where Vargas-Gonzalez's Honda Odyssey was located according to the tracking device placed on his car.[37]

On March 10, 2020, a U.S. Magistrate Judge authorized a search warrant for a pen register and location tracking on Target Telephone 8 because it was believed to contain evidence of narcotics trafficking.[38] That same day, Vargas-Gonzalez began communicating with a phone number with a 908 area code, which investigators in New York had identified as being used by a narcotics trafficker in the New York and New Jersey region.[39] The user of the 908 phone number had recently directed a DEA confidential source to go to a hotel room to purchase approximately

---

[33] Doc. #61 at 38–40.
[34] Doc. #61 at 39.
[35] Doc. #61 at 39.
[36] Doc. #61 at 40–41.
[37] Doc. #61 at 40–42, 88–89.
[38] Doc. #61 at 42–43; Doc. #53-1 at 10–14 (Ex. 3).
[39] Doc. #61 at 43–45, 91.

two to three kilograms of heroin.[40] The hotel room was rented by a person who lived at 905 South 17th Street in Newark, New Jersey.[41]

On March 11, 2020, Target Telephone 8 communicated three to five more times with the same 908 phone number.[42] Because they believed that Vargas-Gonzalez would be leaving Connecticut to conduct a narcotics transaction, Officer Breen and other DEA agents initiated physical surveillance on Vargas-Gonzalez.[43] Vargas-Gonzalez drove the Honda Odyssey alone from Hartford, through New York, to the address of 905-907 South 17th Street in Newark, New Jersey.[44] Another vehicle arrived at that address during the 15 to 20 minutes that Vargas-Gonzalez was there.[45] Vargas-Gonzalez then drove back through New York to Connecticut.[46]

As the DEA agents were following Vargas-Gonzalez back into Connecticut, Officer Breen contacted Connecticut State Police Trooper Phousisongkhamloy Chokbengboune, who was on patrol in the Danbury area near the New York and Connecticut border.[47] Officer Breen explained that the DEA was following a vehicle that was re-entering Connecticut after traveling out of state and that they believed that the driver was transporting narcotics.[48] Officer Breen asked Trooper Chokbengboune to conduct a "walled-off" or "whisper" stop, which is a traffic stop in which a trooper in a marked vehicle tries to establish independent probable cause to stop and search a vehicle so that the DEA can limit its interactions with the person being stopped and avoid disclosing a full investigation.[49]

---

[40] Doc. #61 at 44–45, 105.
[41] Doc. #61 at 45.
[42] Doc. #61 at 45–46, 91.
[43] Doc. #61 at 46.
[44] Doc. #61 at 46.
[45] Doc. #61 at 46–47.
[46] Doc. #61 at 48.
[47] Doc. #61 at 49, 111.
[48] Doc. #61 at 48–50, 99–100, 111–12, 146, 159.
[49] Doc. #61 at 49–50, 52, 100, 112–13, 146, 159.

Trooper Chokbengboune caught up to the Honda Odyssey near Exit 4 off of I-84 in Danbury, Connecticut.[50] Trooper Chokbengboune testified that he pulled up next to the Honda Odyssey and observed that the windows appeared to be illegally tinted.[51] Trooper Chokbengboune traveled directly behind the Honda Odyssey until it pulled into a storefront parking lot, at which point he initiated a traffic stop.[52]

Vargas-Gonzalez was the driver and sole occupant of the Honda Odyssey.[53] He told Trooper Chokbengboune that he did not speak English, so Trooper Chokbengboune called police dispatch and requested a Spanish-speaking trooper to assist.[54] Connecticut State Police Trooper Anlly Diaz was leading field training for a new recruit, Trooper Trainee Andrew Murphy, in Murphy's vehicle.[55] Diaz is a fluent Spanish-speaker, and he and Trooper Trainee Murphy drove to Trooper Chokbengboune's location.[56]

A few minutes later, when Trooper Diaz and Trooper Trainee Murphy arrived at the parking lot where the traffic stop was occurring, Trooper Chokbengboune was in his vehicle processing the motor vehicle stop.[57] Trooper Chokbengboune told Trooper Diaz that he had observed that the car had "really dark tinted windows," that he had initiated a traffic stop once he got to this area, and that he needed Trooper Diaz's help speaking with the operator of the minivan and asked him to try to obtain consent to search it.[58] Trooper Chokbengboune further

---

[50] Doc. #61 at 114–15.
[51] Doc. #61 at 117–18.
[52] Doc. #61 at 122–25.
[53] Doc. #61 at 127; Doc. #69 at 19, 22–23.
[54] Doc. #61 at 127–129.
[55] Doc. #69 at 9.
[56] Doc. #69 at 9, 11–12. Trooper Diaz and Trooper Trainee Murphy were already en route to Trooper Chokbengboune's location to serve as backup when the request for a Spanish translator was made. *Id*. at 12; Doc. #61 at 131.
[57] Doc. #69 at 13, 15.
[58] Doc. #69 at 15–16.

explained to Trooper Diaz that it was a whisper stop, and that "he got information from the federal agents that there was something in the vehicle narcotics related."[59]

Trooper Diaz then approached the car and spoke with Vargas-Gonzalez in Spanish.[60] Diaz testified that Vargas-Gonzalez appeared nervous, but that he ultimately consented to the search of the car.[61] Trooper Diaz told Trooper Chokbengboune that Vargas-Gonzalez had consented to the search, and then Trooper Diaz stood with Vargas-Gonzalez near the car while Trooper Chokbengboune and Trooper Trainee Murphy searched it.[62]

Trooper Chokbengboune found a black plastic shopping bag containing two dark-colored duct-taped objects shaped like bricks in the spare tire well of the Honda Odyssey.[63] Trooper Diaz asked Vargas-Gonzalez to explain what the blocks were, and he responded that he did not want to talk about it.[64] Trooper Chokbengboune attempted to conduct a field test by cutting into one of the bricks with a pocket knife, which revealed a white powdery substance that he believed was a narcotic.[65] A gust of wind blew some of the substance into the air, exposing Trooper Chokbengboune and Trooper Trainee Murphy, and they both immediately began experiencing toxic symptoms consistent with fentanyl exposure.[66] Trooper Diaz called an ambulance, and both Trooper Chokbengboune and Trooper Trainee Murphy were transported to Danbury Hospital, where they recovered.[67]

---

[59] Doc. #69 at 15, 40; *see also* Doc. #61 at 133, 159.
[60] Doc. #69 at 20–21.
[61] Doc. #69 at 26–28. Trooper Diaz was the only person with Vargas-Gonzalez when he purportedly gave consent, and the consent was not memorialized in writing or by video. Doc. #69 at 42–48, 51. Although Trooper Trainee Murphy's vehicle had a dashcam that was in operation during the stop and Trooper Diaz was wearing a body-worn camera during his interaction with Vargas-Gonzalez, the footage was not preserved. Doc. #61 at 143–44, 154; Doc. #69 at 23–26, 38–39, 46–49, 51, 57.
[62] Doc. #61 at 135–37; Doc. #69 at 28–30.
[63] Doc. #61 at 138; Doc. #69 at 31–32.
[64] Doc. #69 at 32.
[65] Doc. #61 at 139–40
[66] Doc. #61 at 140–41; Doc. #69 at 33–34.
[67] Doc. #61 at 141–42; Doc. #69 at 33–35.

Meanwhile, Officer Breen and DEA agents arrived on the scene.[68] A DEA agent field-tested the two brick-shaped objects, which both tested positive for fentanyl and which appeared to be approximately one kilogram each.[69] The DEA took custody of the two kilograms of fentanyl, and also seized a red iPhone from Vargas-Gonzalez's person and a black flip-phone from inside the mini-van.[70] The flip-phone had a phone number taped to the back of the device that matched the phone number for Target Telephone 8.[71] Vargas-Gonzalez was arrested on federal charges and taken to a DEA office.[72]

## DISCUSSION

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., amend. IV. A "search" occurs for purposes of the Fourth Amendment if the police seek information by intruding on a person's reasonable expectation of privacy or by means of trespassing upon one's person, house, papers, or effects. *See United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). A "seizure" occurs for purposes of the Fourth Amendment if the police intentionally terminate one's freedom of movement by means of physical force or by show of law enforcement authority, including by means of a traffic stop. *See Brendlin v. California*, 551 U.S. 249, 254-55 (2007).

Although the Fourth Amendment generally requires the police to obtain a warrant before conducting a search or seizure, the "automobile exception" to the warrant requirement allows the police to conduct a warrantless stop and search of an automobile if the police have probable

---

[68] Doc. #61 at 52; Doc. #69 at 34.
[69] Doc. #61 at 52–54; *see also* Doc. #53-1 at 15 (Ex. 4) (photograph of seized fentanyl).
[70] Doc. #61 at 54–56.
[71] Doc. #61 at 56.
[72] Doc. #61 at 55; Doc. #69 at 35.

cause to believe that the automobile contains contraband. *See United States v. Jones*, 893 F.3d 66, 70 (2d Cir. 2018); *United States v. Wilson*, 699 F.3d 235, 242 (2d Cir. 2012). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (*per curiam*).[73]

"The Supreme Court has relied on two rationales to explain the reasonableness of a warrantless search pursuant to the automobile exception: vehicles' inherent mobility and citizens' reduced expectations of privacy in their contents." *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010). If the automobile exception applies, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017).

The determination of whether there is probable cause is made by evaluating the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). "Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *Jones*, 893 F.3d at 71. "[P]robable cause is a dynamic concept," and "a law enforcement officer's experience and training may permit the officer to discern probable cause from facts and circumstances where a layman might not." *Babilonia*, 854 F.3d at 178.

Vargas-Gonzalez argues that investigators had observed only "normal, everyday, consistent, innocuous and innocent" behavior and that "[w]hen viewed in the totality of the

---

[73] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

circumstances, these observations fall far from the existence of probable cause to justify the warrantless search and seizure of Mr. Vargas-Gonzalez and his vehicle."[74] I do not agree. While some of Vargas-Gonzalez's behaviors may be innocuous on their own, taken together, they represent considerable evidence of his involvement in drug trafficking over a short period of time leading up to the stop and search of his vehicle on March 11, 2020.

To start, the record contains substantial and uncontroverted evidence that Vargas-Gonzalez was the user of Target Telephones 7 and 8, which were consistently being used to communicate with the phone numbers of known or suspected drug traffickers or money launderers over a short period of time leading up to the search.[75] Vargas-Gonzalez does not dispute that he was the user of Target Telephone 7 and that it was in contact with at least a half-dozen phone numbers of known or suspected drug traffickers or money launderers across the country in February 2020. Nor does he challenge the characterization that he "dropped" Target Telephone 7 around February 23, 2020, and that he immediately started using Target Telephone 8 in a similar manner. Of course, investigators do not know the contents of the communications that took place using those telephones. But the pervasiveness of Vargas-Gonzalez's contacts with known or suspected drug traffickers and money launderers suggests that law enforcement had ample reason to believe that he was also involved in such activity, especially given that Vargas-Gonzalez does not dispute that he was the user of those phones or that the phone numbers he was in touch with were generally associated with drug traffickers or money launderers.

Moreover, neither of these phones had any identifying subscriber information. As Officer Breen testified, in his experience drug traffickers and money launderers typically use disposable "work" phones without subscriber information for a short period of time in order to avoid

---

[74] Doc. #37-1 at 13; *see also id.* at 11–12.
[75] Doc. #61 at 102.

detection by law enforcement.[76] At the same time Vargas-Gonzalez was using Target

Telephones 7 and 8, he was also using a personal telephone that was subscribed in his name.[77]

These circumstances strongly support Officer Breen's assessment that Vargas-Gonzalez used

Target Telephones 7 and 8 as "work" phones for drug-trafficking-related activities.

      In addition, the record shows that during the DEA investigation, Vargas-Gonzalez took

multiple brief out-of-state trips in the Honda Odyssey, including one in which he was in close

proximity to a business that investigators had determined was being used for money

laundering.[78] In another instance, Vargas-Gonzalez was communicating with the "work" phone

of a drug trafficker identified by DEA investigators in Massachusetts who traveled to the

Hartford area and, according to GPS tracking, came within about 100 meters of where the Honda

Odyssey was located.[79]

      Although Vargas-Gonzalez could have been engaged in normal, innocuous activities in

each of these instances, they also represent strong circumstantial evidence that Vargas-Gonzalez

was conducting transactions related to drug trafficking. Indeed, the short meet-ups were

consistent with other evidence of how the drug trafficking organization operated, according to

Officer Breen's investigation.[80]

      Against this backdrop, when Vargas-Gonzalez began communicating with a phone

number with a 908 area code that had been identified as being used by a wholesale narcotics

trafficker in New York and New Jersey, Officer Breen and other investigators had ample reason

to believe that the communications related to drug trafficking. The user of that phone number

---

[76] Doc. #61 at 10–12, 14.
[77] Doc. #61 at 101.
[78] Doc. #61 at 29–33, 84–85, 103–104.
[79] Doc. #61 at 40–42, 88–89.
[80] Doc. #61 at 104–105.

had recently directed a DEA confidential source to go to a hotel room to purchase approximately two to three kilograms of heroin.[81]

On March 11, 2020, Vargas-Gonzalez was still communicating with the 908 phone number, and Officer Breen and DEA agents followed him as he traveled from Connecticut to New Jersey.[82] Vargas-Gonzalez drove directly to the address of the person who rented the hotel room that the DEA confidential source was directed to in order to pick up two to three kilograms of heroin.[83] Vargas-Gonzalez stayed there for 15 to 20 minutes, during which time another vehicle arrived, and then he departed back toward Connecticut.[84]

According to Officer Breen, the short stop at the New Jersey address was consistent with other evidence of how the drug trafficking organization that Vargas-Gonzalez belonged to conducted large-scale narcotics purchases.[85] Based on his observations on that day, as well as the evidence developed over the course of his investigation, Officer Breen believed that Vargas-Gonzalez had picked up narcotics in New Jersey and was transporting them in the Honda Odyssey back to Connecticut.[86]

To be sure, as Vargas-Gonzalez emphasizes, Officer Breen and other investigators did not have direct evidence of the content of his communications with the 908 phone number or direct proof they related to drug trafficking. Investigators did not directly observe narcotics or other contraband being put in the Honda Odyssey.[87] The probable cause standard, however, "does not demand certainty but only a fair probability that contraband or evidence of a crime will be found." *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004). Given his extensive

---

[81] Doc. #61 at 44–45, 105.
[82] Doc. #61 at 45–46.
[83] Doc. #61 at 45–46.
[84] Doc. #61 at 46–48.
[85] Doc. #61 at 104–105.
[86] Doc. #61 at 48–49.
[87] Doc. #61 at 94–95.

experience investigating drug trafficking and money laundering organizations, as well as his

knowledge of the operations of Vargas-Gonzalez's drug trafficking organization, Officer Breen

was well-positioned to discern probable cause from the patterns of Vargas-Gonzalez's activities

in early 2020 and the circumstances of his travel to New Jersey the day of the stop and search. I

find Officer Breen's essentially unchallenged testimony to be credible, and I conclude that, under

the totality of the circumstances, there was far more than a fair probability that Vargas-

Gonzalez's Honda Odyssey contained contraband when it was returning from New Jersey to

Connecticut. Accordingly, I conclude that Officer Breen had probable cause that Vargas-

Gonzalez was transporting narcotics prior to the traffic stop and search of his vehicle.

Vargas-Gonzalez argues that the stop was nonetheless unlawful because Trooper

Chokbengboune "was simply instructed by TFO Breen to stop Mr. Vargas-Gonzalez's 2008

Honda Odyssey upon its entrance into Danbury, CT from New York," and the purported reason

for the stop was an unsubstantiated allegation that the vehicle's windows were improperly

tinted.[88] But "under the collective knowledge doctrine, even if the law enforcement officer

actually conducting the search lacks the relevant facts to support probable cause, the search may

nonetheless be permissible if the officer acted on the assessment or instructions of other officers

who did have such facts." *Babilonia*, 854 F.3d at 178. The key inquiry "is whether the law

enforcement officers initiating the search or arrest, on whose instructions or information the

actual searching or arresting officers relied, had information that would provide" probable cause

for the search. *United States v. Colon*, 250 F.3d 130, 135–36 (2d Cir. 2001).

Nor is it relevant that Trooper Chokbengboune did not tell Vargas-Gonzalez at the time

that there was probable cause to stop and search the car for contraband but instead articulated

---

[88] Doc. #37-1 at 6.

different reasons for stopping the Honda Odyssey (window tint) and for searching it (consent). The relevant inquiry for purposes of the Fourth Amendment is whether the facts known (or collectively known) to an officer at the time justify a search and seizure, regardless of the grounds stated by law enforcement at the time as justification for a search and seizure. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (rejecting argument that probable cause to arrest must be predicated on the grounds that the officer states or invokes at the time of arrest); *Jaegly v. Couch*, 439 F.3d 149, 153–54 (2d Cir. 2006) (Sotomayor, J.) (same).

Because law enforcement had probable cause to believe that Vargas-Gonzalez's Honda Odyssey contained contraband, the automobile exception to the Fourth Amendment's warrant requirement applies in this case to justify both the stop and search of the car. Accordingly, there is no need for me to address whether the stop and search of the Honda Odyssey was constitutionally valid on other grounds.

## CONCLUSION

For the reasons set forth above, the Court DENIES the defendant's motion to suppress (Doc. #37).

It is so ordered.

Dated at New Haven this 13th day of December 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge